CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

FEB 14 2017

JULIA C. DUDLEY, CLERK
BY: /s/ _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | |
|---|---|
| **DIEDRA C. WEBB,** ) | |
| ) | |
| **Plaintiff,** ) | **Case No. 7:16-cv-00036** |
| ) | |
| **v.** ) | |
| ) | |
| **KROGER LIMITED PARTNERSHIP I,** ) | |
| ) | **By: Michael F. Urbanski** |
| **Defendant.** ) | **United States District Judge** |
| ) | |

## MEMORANDUM OPINION

This Title VII case is before the court on defendant Kroger Limited Partnership I's

motion for summary judgment, which is docketed as two separate motions for partial

summary judgment—one as to Counts II and III (ECF No. 27) and the other as to Count I

(ECF No. 30). Also pending on the docket are Kroger's motions to strike affidavits (ECF

Nos. 23 & 48), motion for leave to file response to nine of plaintiff's statement of facts

(ECF No. 47). The issues have been extensively briefed and oral argument was held on

January 13, 2017.[1]

In her complaint, plaintiff Diedra C. Webb alleges that while working as co-manager

of Kroger Store #345 in Christiansburg, Virginia, she was subjected to sexual harassment

(Count I), gender discrimination (Count II), and retaliation (Count III), all in violation of

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. Webb has since

abandoned the gender discrimination claim set forth in Count II of her complaint. See Pl.'s

Mem. in Opp. to Def.'s Mots. for Partial Summ. J., ECF No. 44, at n.2. As regards the

---

[1] Following this hearing, Kroger filed eight motions in limine, which remain pending on the docket (ECF No. 57-64).

remaining claims, Webb asserts she was subjected to a hostile work environment as a result of store manager Richard Almond's sexual harassment. She further claims that she was disciplined and ultimately terminated because she complained of Almond's unlawful employment practices.

Because there is insufficient evidence from which a jury could find in Webb's favor on either of these claims, the court will **GRANT** Kroger's motions for summary judgment and dismiss this action with prejudice.

## I.[2]

Webb began working for Kroger as a management trainee in 2007. Dep. Ex. 1, ECF No. 29-13. Following her training, Webb was assigned to various area stores, where she worked as co-manager, and then to the district office where she served as deli/bakery coordinator. Webb Dep., ECF No. 29-2, at 39-41. Webb moved back into store operations in April 2010, at which time she was assigned to Store #402 in Blacksburg. Id. at 42. She was subsequently transferred to Store #345 at the end of March 2012, where she again served as co-manager. Id. at 45, 97. Co-managers are part of the management team and serve under the associate manager and store manager. Id. at 52-53.

Webb testified she was apprehensive about the transfer to Store #345 because of its "inability to meet key retailing goals. Their conditions, meaning their out of stocks, what was on the shelf and what was not. The overall operation of that particular store." Id. at 103. Webb testified she was being transferred to this particular store in order to "push [store

---

[2] The facts of this case are summarized below and, consistent with the summary judgment standard, are viewed in the light most favorable to Webb, even where there are disputed facts that Webb may not ultimately be able to prove. See Walker v. Mod-U-Kraft Homes, LLC, 775 F.3d 202, 205 n.1 (4th Cir. 2014) (citing FDIC v. Cashion, 720 F.3d 169, 173 (4th Cir. 2013)).

2

manager Richard] Almond into getting some of the procedures, meaning key retailing, out of stocks, things of that nature, I could push him to get some of those things in place that were not currently in place there." Id. at 98. Webb was particularly concerned about whether she could "get the job done" because she "knew from working and training [at Store #345] that Mr. Almond was not comfortable with change at all." Id. at 104.

Webb claims that over the course of her eighteen-month employment as co-manager of Store #345, store manager Richard Almond made discriminatory and harassing remarks to her and other female employees. She claims that she "had issues" with Almond on a daily basis: "Every day that I worked with him he made a comment about my make-up, my weight, my attitude, me taking medication, if I was taking care of my husband." Id. at 170. At least three times per week, Almond would tell Webb to put make-up on or ask if she brought her make-up with her to work. Id. at 169. Almond advised Webb she needed to take medication when she was not acting "feminine enough." Id. at 227. He told Webb twice that she needed to lose weight. Id. at 235-37.[3] Almond asked Webb three times—and he asked Webb's husband three times—whether she was "having PMS." Id. at 273. On occasion, Almond made comments about how "women use their womanly ways to get what they want," id. at 171, 256-57, how "most women need office jobs," id. at 273, and how women should "stay home and raise babies," id. at 209; see also id. at 271-73. Almond asked Webb once a week to have "motherly talks"[4] with other female employees, id. at 195, 221, and, on one occasion, told another store employee to "use her motherly voice" and talk to associates "like they were her children," id. at 210. Once, when plaintiff and her husband were upstairs

---

[3] Webb testified that Almond made comments about her weight "at least four times," two of which were during a company-wide weight loss challenge. Webb Dep. at 236.

[4] Webb has a stepson but no biological children. Webb Dep. at 224; John Webb Dep., ECF No. 29-12, at 15.

3

at Store #345, the copy machine was not working. Almond came over, pushed a button to start the machine, and said, "See, it's like a woman. You have to rub them to get them started," or words to that effect. Dep. Ex. 33, ECF No. 29-15, at ¶ 7(b)(iii).

Almond sporadically referred to Webb as the "Kronos[5] Nazi," Webb Dep. at 165-66, 245-46, would speak to her "like [she] can't do [her] job," id. at 165, would tell other store associates not to listen to Webb, id., and once reversed a scheduling change decision she made, id. at 241. He told subordinates, "you know how Ms. Webb is," and, "time to get the confetti and balloons out Ms. Webb is on vacation." Id. at 226. Almond declined to take corrective action against a male subordinate who refused to listen to Webb until she calmed down and who referred several times to women being "emotional." Id. at 238. Several times a week, Almond made demeaning comments towards women in general, such as how women in the store and parking lot looked, id. at 233-35, and how good the female Virginia Tech track team members looked in their uniforms, Dep. Ex. 31, ECF No. 29-15, at ¶ 16; Dep. Ex. 33, ECF No. 29-15, at ¶ 7(b)(iv).

Other store employees were subject to harassing conduct by Almond. On occasion, Almond commented on employee Tiffany Linkous' dress, make-up, and hair, as well as how she "would talk to people in her little girl voice to get what she wanted." Webb Dep. at 195. Specifically, Almond commented one December about Linkous' Santa shirt with a white furry collar, id. at 196, and occasionally would say something about Linkous' hair when she pulled it back to save time when she overslept, id. at 196-97. One time, Almond observed

---

[5] Kronos is the name of the company's time-keeping system. See Dep. Ex. 31, ECF No. 29-15, at ¶ 20.

4

Linkous crying over a breakup with her boyfriend and invited her to "[c]ome here and sit on [his] lap and tell [him] what the problem is." Id. at 197.

Two or three times, when the seasons changed, Almond would ask Ester Richardson, "When are we going to see your legs in the skirt?", and comment about Richardson's skirt being short when she did wear one, or her legs being tan when she returned from vacation. Id. at 198-99. Almond also made Richardson take down a calendar of shirtless firemen displayed out of public view in the bakery—but allowed employee Mike Mull to display the 2013 Sports Illustrated Swimsuit calendar on his desk.[6] Id. at 198-99, 242-44.

Once, Almond "popped" Christy Smith on the buttocks in front of Webb and Smith's mother and said, "You sure do look good in those jeans since you've lost weight." Id. at 172, 259. He also recounted conversations he had had with Smith's ex-husband while on a hunting trip and would "laugh when [Smith] would get upset." Id. at 201.

Almond referred to administrative assistant Ashley Griffith as "a little girl." Id. at 193. One time when Griffith was affixing a band-aid to her boyfriend's cut,[7] Almond stated "that's exactly where men like to see women, on their knees in front of them," or something of that nature. Id.

At least twice, Webb witnessed Almond hugging a young, female employee named Ashley Wells. Id. at 203-05. Almond would hug younger, attractive females in "a two-armed full bear hug," but would give older females and customers "side hugs." Id. at 260-61.

Almond told Tina Gordon that Kroger "is only hiring women to be diversified." Id. at 206. He also told Gordon to brush off a negative comment by another male store

---

[6] This incident was not personally observed by Webb but was related to her by Richardson. Webb Dep. at 199.

[7] Griffith's boyfriend was also a store employee.

5

employee to Gordon about biracial children,[8] stating the employee "doesn't mean it" and to "just let it go." Id. at 207-08.

Webb complained about this behavior to Almond directly and to Human Resources Coordinator Eric Williams. While Webb could not recall how many times she complained to Williams about Almond, the specific dates of those conversations, or exactly what she said, she testified: "I know that it was every conversation that I had with Mr. Williams. I always expressed my concern, my frustration, my fear, in having to associate and deal with Mr. Almond in the way that I did. He was very well aware of that from the very first time that I ever interacted with him as the [Human Resources Coordinator]." Id. at 161. Webb related to Williams her concern that Almond did not like her, gave her push-back, did not support her, and spoke to her like she "can't do [her] job." Id. at 159-65. She further testified that she told Williams once that Almond had referred to her as the "Kronos Nazi," id. at 166, that Almond told her to put on make-up, id. at 167-68, 231-32, that Almond made comments such as "you know how women are," id. at 171, that Almond asked her to have "motherly talks" with female associates, id. 224-25, that Almond told her she needed to lose weight, id. at 236-37, and that Almond commented about how women use their "womanly ways," id. at 256-57. Webb stated Williams would always respond by saying he would speak to Almond about it or that he would look into it. See id. at 237, 258.

However, Webb did not tell Williams about inappropriate comments Almond allegedly made about women in general, id. at 234-35, 272-74, or, for the most part, tell him

---

[8] According to Webb, Gordon is biracial and her children are biracial and this comment offended Gordon. Webb Dep. at 107-08.

6

about Almond's behavior towards other female associates at Store #345,[9] see, e.g., id. at 194, 200, 203, 205, 208-09, 210, 212. Webb stated these issues did not come up in her discussions with Williams because "we were talking about me." See, e.g., id. at 203.

Webb claims she was uncomfortable, stressed and anxious as a result of Almond's harassing conduct. Her husband testified she was withdrawn and would come home in tears. John Webb Dep., ECF No. 29-12, at 30.

On September 3, 2013, district manager David Dantzler, along with Eric Williams, and operations coordinator Tracy McDaniel, met with Webb and terminated her employment with Kroger. Webb Dep. at 181. A complaint had been lodged against Webb on August 21, 2013 about the way she addressed front-end manager Christy Smith concerning scheduling. Dep. Ex. 43, ECF No. 29-16. While Webb thought nothing of this encounter with Smith, it left Smith in tears. Webb Dep. at 173-82; Dep. Ex. 25, 26 & 27, ECF No. 29-15. An investigation ensued and ultimately determined that Webb's behavior was inappropriate and unprofessional. Dep. Ex. 39, ECF No. 29-16. At the September 3 meeting, Dantzler advised Webb she was not entitled to any more warnings. Webb Dep. at 182; Dep. Ex. 45, ECF No. 29-16.

At the time, Webb was on what is known as a Management Development Plan (MDP), a plan that contained sixteen personal and professional objectives Webb was required to complete—one of which was to complete an anger management program. Dep.

---

[9] Webb testified she did not tell Williams about the incidents involving Tiffany Linkous, Ester Richardson, Christy Smith, Ashley Wells, Tina Gordon, Jennifer Seagle, or Michelle Saunders. Webb Dep. at 200, 203, 205, 208-09, 210, 212. Webb testified somewhat inconsistently about whether she told Williams about the incident in which Almond allegedly commented to Ashley Griffith that men liked to see women on their knees. Initially, Webb stated she did not recall telling Williams about this incident "because [she] spoke to Mr. Almond about it," id. at 194, but later testified that she did, in fact, relate this incident to Williams, id. at 265-66. Webb did mention to Williams the fact that Almond hugged female employees and once asked Tiffany Linkous to sit on his lap. Id. at 261-63.

7

Ex. 23, ECF No. 29-15. This plan was designed to improve the way Webb communicated with store associates. Webb Dep. at 182. Webb was placed on this 2013 MDP after receiving a disciplinary letter on February 13, 2013 for speaking to a store associate in a demeaning and derogatory manner the previous month. Dep. Ex. 21, ECF No. 29-15. The letter stated: "You are also 'on final notice' that any future incidents of this nature, will indeed lead to disciplinary action, up to and including, discharge." Id.

This was not the first time Webb was disciplined for the way she communicated with store associates. While working as co-manager at Store #402 in 2011, Webb received a disciplinary letter and was placed on an MDP for similar conduct. Dep. Ex. 11 & 12, ECF No. 29-15. The 2011 disciplinary letter informed that multiple people had reported Webb speaks to store associates in a demeaning and derogatory manner. Dep. Ex. 11, ECF No. 29-14.

At her September 2013 termination, Webb was provided a severance package in exchange for her signature on a waiver and release. Webb Dep. at 182-83. She was told to read it and see if she accepted the terms and was informed she had seven days to rescind after she signed it. Id. at 183. Webb was given an opportunity to ask questions. The only question she asked whether she could still shop at any Kroger store. Id. at 184.

On June 27, 2014, Webb filed a charge of discrimination with the Equal Opportunity Employment Commission alleging sexual harassment, sex discrimination and retaliation. Dep. Ex. 31, ECF No. 29-15. This lawsuit followed.

8

## II.

Pursuant to Federal Rule of Civil Procedure 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. Celotex, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the non-moving party. Glynn, 710 F.3d at 213 (citing Bonds v. Leavitt, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor.'" McAirlaids, Inc. v. Kimberly–Clark Corp., No. 13-2044, 2014 WL 2871492, at *1

9

(4th Cir. June 25, 2014) (internal alteration omitted) (citing Tolan v. Cotton, 134 S. Ct. 1861, 1863 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ." Anderson, 477 U.S. at 255. However, the non-moving party "must set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" Glynn, 710 F.3d at 213 (quoting Anderson, 477 U.S. at 252). Instead, the non-moving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Res. Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 635 (4th Cir. 2005) (quoting Anderson, 477 U.S. at 249). "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." Moss v. Parks Corp., 985 F.2d 736, 738 (4th Cir. 1993) (citing Perini Corp. v. Perini Const., Inc., 915 F.2d 121, 124 (4th Cir. 1990)).

## III.

The Supreme Court has recognized that sexual harassment that creates a hostile or abusive atmosphere in the workplace may give rise to a claim of sex discrimination under Title VII. Meritor Savings Bank v. Vinson, 477 U.S. 57, 66 (1986). A hostile work environment is one that is "permeated with 'discriminatory intimidation, ridicule, and insult,' [and] that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment[.]'" Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (internal citations omitted). "However, Title VII does not 'attempt to purge the workplace of vulgarity' and '[n]ot all sexual harassment that is directed at an individual because of his or her sex is actionable.'" Walker v. Mod-U-Kraf Homes, LLC, 775

10

F.3d 202, 207 (4th Cir. 2014) (quoting Hopkins v. Balt. Gas & Elec. Co., 77 F.3d 745, 753 (4th Cir. 1996)).

To survive summary judgment on a hostile work environment claim, a plaintiff must produce evidence sufficient for a reasonable juror to conclude (1) that the conduct in question was unwelcome, (2) that the harassment was based on gender, (3) that the harassment was sufficiently pervasive or severe to alter the conditions of employment and create an abusive working environment, and (4) that some basis exists for imputing liability to the employer. EEOC v. Central Wholesalers, Inc., 573 F.3d 167, 175 (4th Cir. 2009) (citing EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306, 313-14 (4th Cir. 2008)). Because the court finds Webb cannot satisfy the third element, it will grant summary judgment in defendant's favor on the hostile work environment claim.

Element three of a hostile work environment claim requires a showing that the harassment was severe or pervasive. "A hostile environment exists '[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 277 (4th Cir. 2015) (quoting Harris, 510 U.S. at 21). The severe or pervasive element has "'both subjective and objective components.'" Walker, 775 F.3d at 208 (quoting Central Wholesalers, 573 F.3d at 175). In order to prevail, Webb must show that she "perceived – and that a reasonable person would perceive – the environment to be abusive or hostile." Id. Whether the environment is objectively hostile or abusive is "judged from the perspective of a reasonable person in the plaintiff's position." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75,

11

81 (1998). That determination is made "by looking at all the circumstances." Harris, 510 U.S. at 23. It "is not, and by its very nature cannot be, a mathematically precise test." Id. at 22; see also Oncale, 523 U.S. at 81-82 ("The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed."). In determining whether the conduct was severe or pervasive, courts consider the "'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998) (quoting Harris, 510 U.S. at 23).

Here, Webb has not shown that Almond's alleged conduct was sufficiently severe or pervasive to create an objectively hostile or abusive work environment. The most severe incidents alleged are the "pop" to Christy Smith's buttocks and the comment made to Ashley Griffith that men like to see women "on their knees in front of them."[10] These incidents were isolated, however, and neither is the type of "extremely serious" incident that "'amount[s] to discriminatory changes in the terms and conditions of employment.'" Boyer-Liberto, 786 F.3d at 277 (quoting Faragher, 524 U.S. at 788); see also Sraver v. Surgical Monitoring Servs., Inc., No. CIV. CCB-05-1331, 2006 WL 2190727, at *5 (D. Md. July 27,

---

[10]

> While we must focus primarily 'on [Webb's] personal experience,' Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 190 (4th Cir. 2004), comments made to others are also 'relevant to determining whether [Webb] was subjected to 'severe or pervasive [sexual] harassment,' Jennings, 482 F.3d 695. For '[w]e are, after all, concerned with the "environment" of workplace hostility, and whatever the contours of one's environment, they surely may exceed the individual dynamic between complainant and [her] [coworkers].'"

Sunbelt Rentals, Inc., 521 F.3d at 317.

2006) ("The Fourth Circuit has indicated that such second-hand harassment, although relevant, is less objectively abusive than harassment directed only at the plaintiff." (citing Hopkins v. Balt. Gas & Elec. Co., 77 F.3d 745, 753–54 (4th Cir. 1996))).

The other conduct Webb contends created a hostile work environment—i.e., statements about the way women dress and look; comments about Webb's weight, make-up, or needing medication; hugging female employees—may have been more pervasive, but are far less severe. These comments fall into the category of (at best) "offhand comments" or "simple teasing," Faragher, 524 U.S. at 788, and (at worst) rude, disrespectful, unpleasant, or unprofessional conduct.

Although Webb insists Almond had supervisory authority over her, the record establishes that Almond was not Webb's "supervisor" within meaning of Title VII. See Vance v. Ball State Univ., 133 S. Ct. 2434, 2439 (2013) ("[A]n employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim."); Howard v. Winter, 446 F.3d 559, 566 (4th Cir. 2006) ("The fact that [Almond] was her superior in rank, however, [is] not enough to show that he [is] her supervisor for purposes of Title VII."); see Williams Dep., ECF No. 29-3, at 34-35, 47, 148 (Almond had no authority to hire or fire Webb); Dantzler Dep., ECF No. 29-4, at 116 (Almond had no authority to discipline, transfer, hire or fire Webb). The fact that Almond worked with Webb as a fellow member of Store #345's management team, rather than as her supervisor, lessens the severity and threatening character of his conduct. See Boyer-Liberto, 786 F.3d at 278 ("[A] supervisor's power and authority invests his or her

13

harassing conduct with a particular threatening character." (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 763 (1998))).

There are no allegations in the record that Almond made vulgar gestures or used profanity or sexually-explicit language. There is no evidence Almond made sexually-charged comments to Webb while she was in a vulnerable position. Cf. Wimbush v. Kaiser Foundation Health Plan, No. TDC-14-0525, 2016 WL 775410, at **1, 10 (D. Md. Feb. 29, 2016) (supervisor harassed plaintiff while she was in vulnerable positions, such as when the two were alone in a room with the door closed discussing plaintiff's work). Nor is there evidence that he otherwise engaged in humiliating or physically threatening conduct, or that he made inappropriate physical contact with Webb. To be sure, "harassment need not involve touching or be 'physically threatening' in order to be actionable 'e.g., where it is humiliating and demeaning.'" Walker, 775 F.3d at 209 (quoting Hoyle v. Freightliner, LLC, 650 F.3d 321, 334-35 (4th Cir. 2011) and citing Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 331 (4th Cir. 2003) (en banc)). However, no reasonable jury could rationally find that the comments made by Almond are sufficiently severe or pervasive to create a hostile or abusive work environment. Several of the comments Webb complains of are not even related to her gender—for example, references to Webb being the "Kronos Nazi." Hartsell v. Duplex Products, Inc., 123 F.3d 766, 772 (4th Cir. 1997) ("We have made clear that only harassment that occurs because of the victim's gender is actionable."). Other allegedly offensive comments were gender-oriented. However, "[t]he prohibition of harassment on the basis of sex requires neither asexuality nor androgyny in the workplace; it forbids only

14

behavior so objectively offensive as to alter the 'conditions' of the victim's employment."

Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998).

The Supreme Court has made clear that "conduct must be extreme to amount to a change in the terms and conditions of employment." Faragher, 524 U.S. 788. Indeed, in the Fourth Circuit, "plaintiffs must clear a high bar in order to satisfy the severe or pervasive test." EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306, 315 (4th Cir. 2008).

> Workplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard. Some rolling with the punches is a fact of workplace life. Thus, complaints premised on nothing more than 'rude treatment by [coworkers],' 'callous behavior by one's superiors,' or 'a routine difference of opinion and personality conflict with [one's] supervisor,' are not actionable under Title VII.

Id. at 315-16 (internal citations omitted). When evaluating a hostile work environment claim, the court must be cognizant of the fact that Title VII is not a "general civility code." Oncale, 523 U.S. at 81. While it protects against sexual harassment, it does not reach mere boorishness or crude behavior. EEOC v. Fairbrook Medical Clinic, P.A., 609 F.3d 320, 328 (4th Cir. 2010). "An insulting or demeaning remark does not create a federal cause of action for sexual harassment merely because the 'victim' of the remark happens to belong to a class protected by Title VII." Hartsell, 123 F.3d at 772.

The court's task at this stage of the proceedings is to "examine whether the record contains proof from which a reasonable trier of fact could conclude 'that the environment was pervaded with discriminatory conduct aimed to humiliate, ridicule, or intimidate, thereby creating an abusive atmosphere." Walker, 775 F.3d at 209 (4th Cir. 2014) (quoting EEOC v. Cent. Wholesalers, Inc., 573 F.3d 167, 176 (4th Cir. 2009) (citation and internal quotation

15

marks omitted in Walker)). The court concludes that Almond's conduct complained of by Webb falls short of the objectively severe or pervasive requirement. The facts of this case— with all inferences therefrom drawn in the light most favorable to Webb—simply are not of the same magnitude as those courts in this jurisdiction have found sufficient to establish actionably severe or pervasive harassment. E.g., Walker, 775 F.3d 202 (co-workers grabbed their crotches and made sexually explicit comments to plaintiff like "these nuts are looking for you" and "I bet you could holler real loud, couldn't you" on a near daily basis); Hoyle, 650 F.3d 321 (co-workers affixed a tampon on plaintiff's key ring and placed photos of nude women or women in provocative dress or positions in common areas of the workplace); Okoli v. City of Baltimore, 648 F.3d 216 (4th Cir. 2011) (plaintiff was subject to repeated propositioning and physical touching); Sunbelt Rentals, 521 F.3d 306 (in religiously hostile work environment case, plaintiff was subject to repeated comments that disparaged him and his faith, such "Taliban" and "towel head," comments that challenged his allegiance to the United States, as well as several religiously charged incidents); EEOC v. R&R Ventures, 244 F.3d 334 (4th Cir. 2001) (supervisor discussed sexual positions and experiences with 15-year-old employee, regularly commented about her breasts and buttocks, and asked her if she liked to be spanked); Smith v. First Union National Bank, 202 F.3d 234 (4th Cir. 2000) (supervisor told plaintiff more than 30 times in a few weeks that he prefers males in team leader positions because they are "natural leaders," frequently commented that plaintiff needed "a good banging," told plaintiff "the only way for a woman to get ahead at First Union was to spread her legs," claimed women should be "barefoot and pregnant," and threatened plaintiff by stating "or else you'll see what will happen to you" after barking

16

orders and stating he could "see why a man would slit a woman's throat" after spinning her office chair around to face him); McKinley v. Salvation Army, 192 F. Supp. 3d 678 (W.D. Va. 2016) (supervisor questioned plaintiff during her interview about how she would handle men who may "come on" to her, and during her employment commented on plaintiff's looks, attire, perfume; referred to plaintiff directly and to others as a "Jezebel;" discussed previous adulterous relationships with plaintiff and suggested he was interested in engaging in a similar relationship with her); Wimbush v. Kaiser Foundation Health Plan, No. TDC-14-0525, 2016 WL 775410 (D. Md. Feb. 29, 2016) (supervisor made sexually charged comments to plaintiff, regularly talking about her "titties," commenting that she looked "sexy," that he could "put his dick in [her] nose," and that "it looks like your man is fucking you right").

The offensive conduct complained of in this case is more in line with that described in Hartsell v. Duplex Products, Inc., 123 F.3d 766 (4th Cir. 1997). Plaintiff Margaret Hartsell was employed by Duplex as a sales assistant, whose job was to provide support to three male and one female sales representatives. The harassment complained of by Hartsell included references to sales assistants as "the little people" and "slaves," comments such as "we've made every female in this office cry like a baby," and "why don't you go home and fetch our husband's slippers like a good little wife?" Id. at 768-69. Hartsell alleged that upon seeing a "rather buxom" woman in a low-cut shirt, one male sales representative asked, "Why don't we have sales assistants that look like that?" Id. at 768. Hartsell witnessed an area manager ask the female sales representative whether she would be a "mini-van driving mommy" or "be a salesperson and play with the big boys" after the birth of her child. Id. at 768. Once,

17

when Hartsell was working on a computer graphics program at her desk, two male sales representatives who wanted to play a golf game on her computer began kicking and pushing her chair, told her she did not know what she was doing, and tried to force her out of the program. Id. at 769. In affirming the district court's grant of summary judgment, the Fourth Circuit held:

> There is no allegation that Hartsell was inappropriately touched, propositioned, flirted with, taunted, or even ogled. None of the alleged comments were even vulgar, much less obscene. In fact, the only vulgarities documented in the record—a reference to masturbation and profane name-calling—were uttered by Hartsell herself. Under these circumstances, allowing Hartsell's claim to go to trial would countenance a federal cause of action for mere unpleasantness. Title VII is not a federal guarantee of refinement and sophistication in the workplace—in this context, it prohibits only harassing behavior that is so severe or pervasive as to render the workplace objectively hostile or abusive. The behavior here falls well short of that mark.

Id. at 773 (citations omitted); see also Srvaer v. Surgical Monitoring Services, Inc., No. CCB-05-1331, 2006 WL 2190727 (D. Md. July 27, 2006) (granting summary judgment as to hostile work environment claim where plaintiff alleged business owner regularly greeted her by asking, "Good morning/good afternoon, Carole, did you get laid last night?" or "How's the sex life?", told her "you'll get a bonus when I get a blow job," noticeably glanced and commented on her breasts, and reported during staff meetings that he was "on a liquid diet to make my dick look bigger," finding comments and behavior were not of the same magnitude as those the Fourth Circuit has found actionable).

As in Hartsell, the conduct alleged by Webb in this case is "so far from the paradigmatic case of sexual harassment," 123 F.3d at 773, that summary judgment is appropriate. "Title VII does not guarantee a happy workplace, only one free from unlawful

18

discrimination." Id. As such, the court will grant summary judgment in defendant's favor as to Count I.

## IV.

In Count III of her complaint, Webb alleges that she was disciplined and ultimately terminated as a result of her complaints about Almond's unlawful employment practices. Title VII prohibits employers from retaliating against an employee because of that employee's participation in a protected activity, including opposition to, or complaints about, an unlawful employment practice. 42 U.S.C. § 2000e–3(a); Hopkins v. Baltimore Gas & Elec. Co., 77 F.3d 745, 754 (4th Cir. 1996). To establish a prima facie case of retaliation, Webb must prove three elements: (1) that she engaged in protected activity; (2) that an adverse employment action was taken against her; and (3) that there was a causal link between the protected activity and the adverse employment action. Laughlin v. Metropolitan Wash. Airports Auth., 149 F.3d 253, 258 (4th Cir. 1998). Plainly, an adverse employment action was taken against Webb, as her employment was ultimately terminated. The court will therefore focus its analysis on elements one and three.

"Protected activity under Title VII is divided into two categories, opposition and participation." Id. at 257. "Opposition activity encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." Id. at 259. Participatory activities include "(1) making a charge; (2) testifying; (3) assisting; or (4) participating in any manner in an investigation, proceeding, or hearing under Title VII." Id. at 259. Webb's retaliation claim is premised on her allegation that she complained about Almond's unlawful employment

19

practices during her employment with Kroger—prior to her filing an EEOC complaint or any ensuing proceedings. The court therefore considers Webb's claim under the opposition clause.

Title VII protects activity in opposition not only to employment actions that are actually unlawful but also employment actions an employee reasonably believes to be unlawful. EEOC v. Navy Fed. Credit Union, 424 F.3d 397, 406 (4th Cir. 2005). An employee need not engage in any formal process of adjudicating a discrimination claim for it to qualify as oppositional activity. Laughlin, 149 F.3d at 259.

Here, Webb asserts she complained to Eric Williams about what she believed to be unlawful conduct by Almond. She stated: "That is the kind of relationship that Mr. Williams and I had when I was in that store. It was constant back and forth about my relationship and my inability to do my job with Mr. Almond." Webb Dep. at 170-71. Webb testified in her deposition that she had conversations with Williams about Almond several times on the phone while Williams was traveling, id. at 161, once during a meeting at Macado's restaurant, id. at 162, during store walks, id. at 164-68, and in meeting with Williams about her progress on her 2013 MDP, id. at 159. Webb, on the whole, could not recall specific dates of her conversations with Williams, or their exact content, but testified: "[T]here wasn't a time that went by that I did not communicate something to Mr. Williams about something that [Almond] was doing to me or not doing that he was supposed to be." Id. at 170. For the most part, the conversations with Williams that Webb recounted in her deposition were those in which she expressed concern about Almond interfering with her ability to do her job—for example, she testified, "Any time that I tried to do something that wasn't on

20

[Almond's] plan, that wasn't on his radar, I hit a brick wall and my hands were tied in what I could do." Id. at 162; see also id. at 159, 163-65.

Williams' deposition testimony corroborates these types of complaints by Webb. For his part, Williams testified he does not remember communicating with Webb much before January 2013,[11] and the complaints he did receive from Webb about Almond "were general and they were, as I said before, 'I don't think Richard [Almond] likes me. Richard is not supportive.'" Williams Dep., ECF No. 29-3, at 73; id. at 64 ("There were times that she complained that she felt that Richard Almond didn't support her or that he didn't like her. Other than that, I don't recall specifics of—any specifics with regard to Richard's treatment of [Webb] specifically."); see also id. at 66.[12] Williams was adamant that he never received any complaints from Webb that he would consider sexual harassment or complaints that Webb was being treated differently because she was a woman. Id. at 72, 101, 112, 113, 115-16, 117-18, 123. Nor did Williams ever hear any complaints—from Webb or anyone else—about how Almond related to other females or that he was demeaning towards women in general. See id. at 98, 111-13, 118, 121-22, 123, 124, 125.

To the extent there is a factual issue about whether or not Webb reported what she believed to be unlawful activity to Williams, it need not be resolved. Even crediting Webb's assertion that she engaged in protected activity, her retaliation claim still fails, because there is no evidence of causation.

---

[11] An incident in January 2013 involving store employee Doug Gathercole led to Webb's 2013 disciplinary letter and MDP. See Webb Dep. at 114-152.

[12] Williams' testimony about the types of complaints raised by Webb about Almond are corroborated by Webb's counseling records, attached as an exhibit to her brief in opposition to summary judgment. ECF No. 54-6. Webb was required to complete an anger management program as one of the objectives of her 2013 MDP, and she was referred through her EAP to Alexa Z. Casey, Psy.D., LCP. Casey's records reflect Webb's reports of "signif[icant] problems at work with her boss," and a "conflictual relationship" with Almond, but, notably, mention nothing about sexual harassment by Almond or disparate treatment on account of Webb's gender.

21

To satisfy the causality requirement of a retaliation claim, "the employer must have taken the adverse employment action *because* the plaintiff engaged in a protected activity." Dowe v. Total Action Against Poverty, 145 F.3d 653, 657 (4th Cir. 1998) (emphasis in original); see Univ. of Texas Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533 (2013) ("Title VII retaliation claims must be proved according to traditional principles of but-for causation. . . . This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."). "Since, by definition, an employer cannot take action because of a factor of which it is unaware, the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element of the prima facie case." Dowe, 145 F.3d at 657. Specifically, it is the relevant decisionmaker who must be aware that plaintiff engaged in protected activity. Id.; see also Holland v. Washington Homes, Inc., 487 F.3d 208, 219 (4th Cir. 2007).

In this case, the evidence establishes that the relevant decisionmaker is district manager David Dantzler. It was Dantzler who signed off on Webb's 2013 MDP, which was drafted by the HR department, and it was Dantzler who ultimately made the decision to terminate her in September 2013, after consultation with the HR and legal departments.[13] See Williams Dep. at 76-78, 88; Dantzler Dep., ECF No. 29-4, at 48, 107-08. Webb offers no evidence whatsoever to suggest that Dantzler knew she complained about what she believed to be Almond's unlawful conduct. Webb does not assert that she told Dantzler that Almond behaved inappropriately towards her or other female employees. Notably, Dantzler testified that he and Webb

---

[13] Webb testified that she did not know who made the decision to terminate her. Webb Dep. at 181. And while she suspected Almond was involved, she testified that she did not know for a fact that Almond played any role in her 2013 MDP. Id. at 246.

22

had a lot of open conversations about managing people, leading, how to lead, and quite honestly, she was highly encouraged to continue the progress she made after successfully completed that first MDP.

Q. You said she would seek out your guidance?

A. She would.

Q. Would that be via e-mail?

A. No.

Q. You would just talk on the telephone or in person, or what was your recollection?

A. Store visits. During the store walk.

Dantzler Dep. at 22. Although Webb sought out Dantzler's guidance during her employment with Kroger, she never complained about Almond's harassing conduct. In fact, Dantzler testified that Webb did not complain about Almond at all. Id. at 125. Dantzler recalled Webb expressing concern to him during a store walk that she would be treated differently after being placed on the 2013 MDP. Id. at 122. But he did not recall Webb seeking guidance concerning her interactions with any members of the management team at Store #345, including Almond. Id. at 24. Dantzler testified that Webb never communicated any concern about Almond treating her differently than any other member of the management team, or concern Almond did not like her, or concern Almond was trying to get rid of her. Id. at 71-72. Dantzler testified that Webb never told him Almond treated her differently because she was a woman or related any inappropriate comments or offensive behavior by Almond or mentioned Almond engaged in conduct she would consider sexual harassment. Id. at 74, 112-13.

23

Dantzler testified he understood from Eric Williams that Webb had raised some concern at a 2013 MDP progress meeting that Almond was "being inconsistent with how he treated her." Id. at 102. Dantzler stated:

> She voiced a concern to Eric [Williams], from my understanding, of both what he wrote and our subsequent conversations that Richard wasn't supporting her in the efforts like she thought he should, but it was our belief [Webb] had not made at that time any attempt whatsoever to fulfill the requirements of the plan and that it was her belief that [Almond] wasn't supporting her, and we didn't find merit at that time. It seemed more like to us a personality conflict.

Id. at 104. There is simply no evidence in this record to establish Dantzler knew Webb had engaged in protected activity.

Nor is there any other indirect evidence of retaliatory intent that might raise some suggestion of a causal connection between the alleged protected activity and the adverse employment action. Webb offers no evidence of a temporal proximity between her complaints to Williams about Almond and her placement on the 2013 MDP or her termination. See Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'"). Indeed, Webb does not recall the dates of the vast majority of the alleged complaints she raised to Williams about Almond.

The record likewise contains no evidence of recurring retaliatory animus. See Lettieri v. Equant Inc., 478 F.3d 640, 650 (4th Cir. 2007) ("Specifically, evidence of recurring retaliatory animus during the intervening period can be sufficient to satisfy the element of

24

causation."). Moreover, there were no inconsistent reasons given for Webb's termination or any other suspicious circumstances surrounding this adverse employment action. In fact, the reasons for the disciplinary action taken against Webb and her eventual termination are well documented in the record, and that documentation is consistent. The fact that Webb received two disciplinary letters and was placed on two MDPs for the same reason—speaking to store associates in a demeaning or derogatory manner—while working at two different Kroger stores further cuts against any argument that she was terminated for any reason other than the stated one.

In short, there is no evidence from which a jury could conclude there is a casual connection between the protected activity and the adverse employment action. Webb cannot establish that Kroger would not have "taken the adverse employment action but for a design to retaliate." Nassar, 133 S. Ct. at 2535. As such, she cannot make out a prima facie case of retaliation, and summary judgment must be granted in defendant's favor as to Count III.

## V.

For these reasons, the court will **GRANT** Kroger's motions for partial summary judgment (ECF No. 27 & 30) and **DISMISS** this case with prejudice. Because the issues raised in Kroger's motions to strike affidavits and motion for leave to file response to nine of plaintiff's statement of facts (ECF Nos. 23, 47 & 48), as well as its eight motions in limine (ECF Nos. 57-64), are moot, the court will deny these motions.

25

An appropriate Order will be entered.

Entered: 02/14/2017

/s/ Michael F. Urbanski

Michael F. Urbanski
United States District Judge